[Cite as *In re D.R.*, 2021-Ohio-3350.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

IN RE D.R.

A Minor Child

:

:

:

No. 110212

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 23, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-20-105112

*Appearances:*

Cullen Sweeney, Cuyahoga County Public Defender, and
Aaron T. Baker, Assistant Public Defender, *for appellee.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Gregory Ochocki, Assistant Prosecuting
Attorney, *for appellant.*

LISA B. FORBES, J.:

{¶ 1} The state of Ohio appeals the juvenile court's judgment denying the state's motion to transfer jurisdiction of this case from the juvenile court to the general division of the Cuyahoga County Common Pleas Court. The state argues that the juvenile court erred in denying its motion to transfer the case because the state provided credible evidence to support a finding of probable cause to believe that D.R. committed aggravated robbery as alleged in the complaint. After a

thorough review of the record and law, this court affirms the juvenile court's judgment.

## I. Facts and Procedural History

{¶ 2} The instant matter arose from an incident that occurred on May 27, 2020. At the time, D.R. was 16 years old. The victim, Nathaniel Turner, was interested in purchasing a vehicle on the website OfferUp. Turner contacted the seller and arranged a meeting to complete the transaction. According to Turner, as he and the seller were driving to the Bureau of Motor Vehicles ("BMV") to have the vehicle's title transferred to Turner's name, the seller pulled out a firearm. A struggle ensued, and a shot was fired during the struggle for control of the weapon. Turner gained control of the firearm and ran away. Turner subsequently identified D.R. in a photo array as the vehicle's seller.

{¶ 3} On June 3, 2020, in Cuyahoga J.C. No. DL-20-105112, D.R. was charged in a ten-count complaint with the following offenses: (1) aggravated robbery, in violation of R.C. 2911.01(A)(1), (2) felonious assault, in violation of R.C. 2903.11(A)(2), (3) kidnapping, in violation of R.C. 2905.01(A)(2), (4) robbery, in violation of R.C. 2911.01(A)(1), (5) robbery, in violation of R.C. 2911.01(A)(2), (6) robbery, in violation of R.C. 2911.01(A)(3), (7) receiving stolen property, in violation of R.C. 2913.51(A), (8) improperly handling firearms in a motor vehicle, in violation of R.C. 2923.16(B), (9) carrying a concealed weapon, in violation of R.C. 2923.12(A)(2), and (10) criminal damaging or endangering, in violation of R.C.

2909.06(A)(1). Counts 1-6 contained one- and three-year firearm specifications. Count 7 contained a one-year firearm specification.

{¶ 4} On June 8, 2020, the state filed (1) a notice of mandatory bindover and request for a probable cause hearing, and (2) a motion for an order relinquishing jurisdiction of the case for the purpose of criminal prosecution pursuant to R.C. 2152.10(B) and Juv.R. 30. In its motion to transfer jurisdiction of the case from the juvenile court to the general division for criminal prosecution, the state argued that the case should be bound over to the general division because D.R. was charged in the complaint with aggravated robbery and kidnapping, category two offenses, and the complaint alleged that D.R. committed these offenses while he was in possession of a firearm. The state subsequently acknowledged that only the aggravated robbery offense in Count 1, and not the kidnapping offense in Count 3, subjected D.R. to mandatory bindover.

## II. Hearing Testimony

{¶ 5} On November 13, 2020, the juvenile court held a probable cause hearing on the state's motion to transfer. The following individuals testified on behalf of the state at the probable cause hearing: (1) Nathaniel Turner, (2) Eugene Bell, (3) Officer Gino Trinh, (4) Detective Zara Hudson, and (5) Detective Timothy Cramer.

{¶ 6} Turner testified as follows about what happened in May 2020 when he was "looking to buy a car":

I'll just tell you the story from the start.  So from OfferUp I went to go — I was looking to buy a car from OfferUp and I found the car and I contacted the dude and we chose to meet up at a spot to get the title for the car we was going to the place to get the title from the DMV.[1]  And we was going there, but we didn't go there.  We went somewhere else.

{¶ 7} Turner and the seller met "somewhere," and the seller brought the car Turner was interested in purchasing.  Turner got into the seller's car, with the understanding that they were going to the BMV.  The seller began driving.  Turner knew the way to the BMV and realized that the seller was going the wrong way.  When Turner asked the seller where he was going, the seller indicated that he was going to a different BMV.  Turner testified,

So we rode like in another direction and the dude pulled a gun out and once I seen the gun we tussled over the gun in the car.  Once we tussled over the gun in the car, the car like jumped a hill and came to a stop and we were still tussling over the gun.  The door opened, I guess he opened his door before he pulled out the gun and we started tussling and we ended up tussling like outside the car for the gun in a field.  And we was tussling with it and the gun went off as we was tussling and I was able to get the gun and run away and I got away.

And once I got away, I was like — and I had the gun I was like — yeah, I was like I got the gun and I thought it was over with, but I guess he was like — I don't know.  He was trying to get it back or something.  I don't know.

{¶ 8} Turner continued,

So when I was able to get the gun I thought it was like over with, he was going to run away or something, but he got back in the car and, you know, chased me with the car, tried to hit me, hit the building.  I run away into somebody's backyard and try to get away and hop the gate and I ran into some guy back there and pretty much I told him like what had happened and he had called the cops and that was it.

---

1 Turner refers to the Bureau of Motor Vehicles as the "DMV" throughout his testimony.

{¶ 9} The state showed Turner a screenshot of a 1999 Honda Accord LX that was for sale on OfferUp and asked Turner if he recognized the vehicle in the picture. Turner replied, "[t]hat was the vehicle, but it's messed up." Asked what vehicle, Turner answered "[t]he vehicle I was going to purchase off OfferUp." Turner further testified "that's the car," but did not recall it being "messed up like that." The state next asked Turner to describe the firearm that he saw that day. Turner described it as "gray or steel." The state showed Turner a picture of the gun he gave to the police on May 27, 2020, and asked him if it looked "like the firearm from that day." Turner replied, "I think so. Yeah, that was it."

{¶ 10} Regarding the individual he encountered when he was running away from the seller, Turner explained that he met an older guy cutting the grass in his backyard. Turner testified, "I just told him what had happened and he was like okay, I'm about to call the police now." Turner waited in the individual's yard until the police arrived. When the police arrived, Turner told them what happened and turned over the firearm.

{¶ 11} The police returned to Turner's house on two occasions following the incident. The first time the police came back, they asked Turner to identify the seller from a photo array. The second time, they collected a DNA sample.

{¶ 12} Turner identified state's exhibit No. 5A as the photo array police presented to him. Police asked Turner to circle the vehicle's seller from the photo array and indicate how certain Turner was that it was, in fact, the individual that Turner was with on May 27, 2020.

**{¶ 13}** Asked whether he saw the vehicle's seller in the courtroom during the probable cause hearing, Turner testified, "[h]e's over there wearing the jacket, I mean, the sweater, the blue sweater." The state asked, "Your Honor, may the record reflect that the alleged victim has identified the alleged delinquent?" The juvenile court replied that Turner's "testimony will stand."

**{¶ 14}** On cross-examination, Turner testified that he spoke with the seller for a couple of seconds before willingly getting into the car for the purpose of driving to the BMV to transfer title of the car to Turner. Turner never drove the car. Turner testified that he and the seller had agreed on a price for which Turner would purchase the vehicle. However, Turner could not recall the agreed-upon price. Turner testified he did not tender any money to the seller prior to May 27, 2020, and he did not bring any money with him to the meeting.

**{¶ 15}** Eugene Bell, the individual that Turner encountered as he was running away from the seller, testified that he was in his backyard when he observed an individual jump the fence. The individual ran towards Bell and was "hollering that he needed help, somebody was trying to kill him."

**{¶ 16}** Turner asked to go inside Bell's house to use the phone "because somebody is about to kill [him]." Bell did not let Turner go inside the house, but they went inside Bell's garage. Regarding Turner's demeanor, Bell explained,

> [Turner] was shaking and scared. He said, I ain't going to hurt you or nothing. I just need somebody to call the police or get me some help. He's trying to kill me. So he was shaking and stuttering and sweating. And I said, hey, man, you got to calm down, you know. And he said, yeah, they're after me. I said, well, go in the garage[.]

{¶ 17} Upon the juvenile court's inquiry, Bell confirmed that Turner said "they are trying to kill me." Bell thought it was a group of people. Bell called the police and gave his cell phone to Turner who spoke with the dispatcher. A recording of this conversation was played at the probable cause hearing as state's exhibit No. 7.

{¶ 18} Cleveland Police Officer Gino Trinh testified that police received a call for an aggravated robbery at East 127th Street and Gay Avenue. Officer Trinh responded to the scene with his partner. Regarding his observations of Turner, Officer Trinh testified, "[Turner] was shooken up. He seemed tired to me. He told us that he was running across yards. He had abrasions on his hands and some gun powder residue on his jacket." Turner informed officers he had a firearm on him, and the officers recovered this weapon. The firearm was "a silver and black Kahr," which Officer Trinh described as a "small handgun."

{¶ 19} Officer Trinh confirmed on cross-examination that he observed powder burn on Turner's chest, indicating that Turner was in close proximity to gun fire. The firearm was unregistered.

{¶ 20} Cleveland Police Detective Zara Hudson testified that she administered the photo array "blindly" to Turner, meaning she had no understanding of the case or individuals involved. When Detective Hudson presented the photo array to Turner, Turner circled D.R.'s photograph and indicated that he was 95 percent certain that this was the person he met on May 27, 2020, to purchase the vehicle.

{¶ 21} Cleveland Police Detective Timothy Cramer testified that he was assigned to investigate an alleged aggravated robbery that occurred on May 27, 2020, involving Turner. Detective Cramer learned that the vehicle in question was a 1999 Honda Accord that was parked at 12809 Gay Avenue following the incident. Detective Cramer explained that Turner took screenshots of the vehicle from OfferUp and turned the photographs over to police. Detective Cramer identified state's exhibit Nos. 2 and 3 as screenshots of the OfferUp account that Turner had taken before the account had been deleted.

{¶ 22} Based on the information Turner provided to police, Detective Cramer learned that the name "Shawn" was connected with the OfferUp account from which the vehicle was listed for sale. Detective Cramer explained, however, that he did not personally observe or have firsthand knowledge that D.R. or an individual named "Shawn" was affiliated with the OfferUp account. This information came from the police report in which Turner stated that the vehicle's seller identified himself as "Shawn."

{¶ 23} Detective Cramer testified that he was familiar with the vehicle in question from an incident that occurred on May 4, 2020. The vehicle was parked at 12809 Gay Avenue, and several shots were fired from another vehicle into the house and at the vehicle in question. Detective Cramer explained, "I towed this same vehicle about three weeks prior in connection with a separate incident in which the vehicle was struck by gunfire. That incident occurred at 12809 Gay [Avenue] and I

am familiar that [D.R.] is known to be at that address. [D.R.] was known to have ownership of that vehicle."

{¶ 24} At the time of the May 4, 2020 shooting, the vehicle was towed and processed. D.R. was listed in Detective Cramer's report as the victim. D.R. stated "that he owned the car, that the car was in his possession." Detective Cramer had inquired about the vehicle's ownership and discovered that D.R. did not legally own the vehicle. Rather, a female held title to the vehicle. When Detective Cramer spoke with the titleholder, she informed him that she had recently sold the car to a younger black male.

{¶ 25} When Detective Cramer told D.R. that D.R. did not hold title to the vehicle, D.R. asserted that the BMV was closed due to the COVID-19 pandemic and, as a result, he had not been able to have the title switched to his name.

{¶ 26} During the course of his investigation into the May 27, 2020 incident, Detective Cramer made the connection to D.R. based on (1) Turner's statement to police that the name "Shawn" was affiliated with the OfferUp account that listed the vehicle for sale, (2) the OfferUp photographs that Turner provided to police, and (3) Detective Cramer's prior involvement with the vehicle in question from the May 4, 2020 shooting incident.

{¶ 27} Detective Cramer did not observe any bullet holes or defects in the vehicle shown in the OfferUp screenshots that Turner provided to police. He explained, however, that the screenshots did not depict the entire vehicle, and that they only showed the passenger side. The OfferUp screenshots depicted fresh

damage to the passenger side of the vehicle. Detective Cramer explained that the damage to the vehicle's passenger side was present when he towed the car earlier in May.

{¶ 28} Detective Cramer confirmed that he was unable to determine when the screenshots of the vehicle in question were taken or posted to OfferUp. Nor was he able to ascertain who posted the photographs. Detective Cramer did not know how, or by what means, the female titleholder sold the vehicle in question. Detective Cramer attempted to locate the OfferUp account at issue; however, the account had been deleted. Detective Cramer contacted OfferUp for assistance, but the company was unable to locate the account from which the vehicle was posted.

{¶ 29} After the May 27, 2020 incident, Detective Cramer tried to locate the vehicle on multiple occasions, but he was unable to do so. Detective Cramer learned that the vehicle in question was registered to another individual who did not reside in Cleveland.

{¶ 30} In addition to the testimony of Turner, Bell, Officer Trinh, Detective Hudson, and Detective Cramer, the state presented the following exhibits at the probable cause hearing: exhibit No. 1: a photo of the firearm Turner provided to police; exhibit Nos. 2 and 3: OfferUp screenshots of the vehicle that Turner provided to police; exhibit No. 4: a Cleveland Police Department test-fire report indicating that the gun Turner provided to police was operable; exhibit Nos. 5, 5A, and 5B: the photo array that was administered to Turner; and exhibit No. 7: the audio recording of the phone call between Bell, Turner, and the police dispatcher.

{¶ 31} On November 25, 2020, the juvenile court denied the state's motion to transfer, concluding that "there is insufficient, credible evidence to show probable cause to believe that [D.R.] committed the acts alleged in the complaint." On January 6, 2020, the state filed the instant appeal challenging the juvenile court's judgment. The state assigns one error for review:

> I. The juvenile court erred when it did not find probable cause to believe that [D.R.] committed the acts alleged in the complaint.

### III. Law and Analysis

{¶ 32} R.C. 2152.12(A) governs mandatory transfers of juvenile cases to the general division of the common pleas court. It states in pertinent part as follows:

> After a complaint has been filed alleging that a child is a delinquent child by reason of committing a category two offense, the juvenile court at a hearing shall transfer the case if the child was sixteen or seventeen years of age at the time of the act charged and * * *[.]
>
> (ii) Division (A)(2)(b) of section 2152.10 of the Revised Code requires the mandatory transfer of the case, and there is probable cause to believe that the child committed the act charged.

R.C. 2152.12(A)(1)(b)(ii).

{¶ 33} Pertaining to the case at hand, aggravated robbery, in violation of R.C. 2911.01, constitutes a category two offense. R.C. 2152.02(BB). The next step in determining whether a juvenile case is subject to mandatory bindover involves R.C. 2152.10(A)(2)(b), which states that "[t]he child is alleged to have had a firearm on or about the child's person or under the child's control while committing the act charged and to have displayed the firearm, brandished the firearm, indicated

possession of the firearm, or used the firearm to facilitate the commission of the act charged."

{¶ 34} In the case at hand, the parties stipulated that D.R. was 16 years old at the time of the incident. The acts charged in Count 1 of the complaint would constitute the offense of aggravated robbery if committed by an adult. Furthermore, the act charged in Count 1 contained one- and three-year firearm specifications pursuant to R.C. 2941.141(A) and 2941.145(A). Therefore, this case falls within the mandatory bindover provisions set forth in R.C. 2152.10(A)(2)(b) and 2152.12(A)(1). *See In re C.G.*, 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, ¶ 30; Juv.R. 30.

{¶ 35} Pursuant to Juv.R. 30(A), "[i]n any proceeding where the court considers the transfer of a case for criminal prosecution, the court shall hold a preliminary hearing to determine if there is probable cause to believe that the child committed the act alleged * * *." On appeal, the state argues that the juvenile court erred in not transferring the case because the state provided credible evidence of every element of the aggravated robbery offense to support a finding of probable cause to believe D.R. committed the offense. The state is essentially challenging the juvenile court's conclusion that "there is insufficient, credible evidence to show probable cause to believe that [D.R.] committed the acts alleged in the complaint."

> The Ohio Supreme Court has instructed that "the state must present credible evidence of every element of an offense to support a finding of probable cause, but that evidence does not have to be unassailable." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 46, citing [*State v. Iacona*, 93 Ohio St.3d 83, 752 N.E.2d 937 (2001)]. The Supreme Court further explained, the juvenile court's role in bindover proceeding is that of a "gatekeeper" because it is "charged with

evaluating whether *sufficient credible evidence exists*" to warrant transfer to adult court. *Id.*, citing *In re A.J.S.*, 173 Ohio App.3d 171, 2007-Ohio-3216, 877 N.E.2d 997 (10th Dist.).

(Emphasis added.) *State v. Hughley*, 8th Dist. Cuyahoga No. 108518, 2020-Ohio-1277, ¶ 35.

{¶ 36} This court defers to the juvenile "court's credibility determinations by reviewing for an abuse of discretion, but we conduct a de novo review of the legal conclusion whether there was probable cause to believe that the juvenile committed the charged act." *In re C.G.* at ¶ 31. *See also State v. Martin*, 8th Dist. Cuyahoga No. 108996, 2021-Ohio-1096, ¶ 15 (a witness's testimony and credibility are "best assessed by the trial court.") "The trier of fact is in the best position to make credibility determinations because it is able to view the demeanor of a witness while he or she is testifying; this court cannot. The trier of fact is therefore in the best position to determine if the proffered testimony is credible." *Khatib v. Peters*, 2017-Ohio-95, 77 N.E.3d 461, ¶ 28 (8th Dist.).

{¶ 37} After reviewing the record based on the evidence presented at the probable cause hearing, and in light of the deferential standard of review we must apply to the juvenile court's credibility determinations, we conclude that the juvenile court did not err or abuse its discretion in finding that the state failed to present sufficient credible evidence to establish probable cause that D.R. committed the pertinent acts charged in the complaint necessary to support a mandatory bindover.

{¶ 38} The record reflects that the juvenile court considered the facts and circumstances of the May 27, 2020 incident based upon which D.R. was charged,

and listened to the testimony at the probable cause hearing. The juvenile court did not issue its ruling from the bench. Rather, the court took the matter under advisement following the probable cause hearing. After 12 days, the juvenile court issued its judgment entry denying the state's motion to transfer the case.

{¶ 39} The record reflects that throughout the probable cause hearing, the juvenile court questioned whether the vehicle that Detective Cramer had been involved with on May 4, 2020, during his first interaction with D.R., was the same vehicle that was listed for sale on OfferUp or the same vehicle that Turner got into on May 27, 2020. The juvenile court opined that if the same vehicle were involved in the May 4, 2020 incident, the vehicle "would have had some [bullet] defects in it" at the time of the May 27, 2020 transaction.

{¶ 40} The juvenile court questioned whether, after the May 4, 2020 incident, the vehicle was released to D.R., a juvenile, after it had been towed and processed. The juvenile court opined that following the May 4, 2020 incident, the vehicle "was *possibly* released to [D.R.] in its defective state[.]" The juvenile court further opined that the vehicle would have been in its defective state at the time of the May 27, 2020 transaction facilitated by OfferUp.

{¶ 41} The juvenile court appeared to question whether the police would release the vehicle to a juvenile who did not hold title to that vehicle. Detective Cramer confirmed that he was not present when the vehicle was released.

{¶ 42} The juvenile court further appeared to question the credibility of state's exhibit Nos. 2 and 3, the OfferUp screenshots of the vehicle taken by Turner

that were subsequently provided to police.  Detective Cramer testified that he made the connection between D.R. and the May 27, 2020 transaction based, in part, on these screenshots.

{¶ 43} The juvenile court questioned whether these screenshots were posted by D.R. or the record titleholder that purportedly sold the vehicle to D.R.  The juvenile court explained, "[b]ecause if [the screenshots depicted] the same fresh damage that [Detective Cramer] observed from the [May 4, 2020] tow without the bullet defects, would it be unreasonable for the Court to believe that [the screenshots] could have been OfferUp pictures from [the titleholder's] account?"  Detective Cramer confirmed that he could not tell when, or by whom, the screenshot photos were taken and posted to OfferUp.  Detective Cramer also confirmed that he did not ask the titleholder how, or by what means, she sold the vehicle.

{¶ 44} Turner's testimony during the probable cause hearing was vague, lacking in detail, and inconsistent.  For instance, Turner testified that he met the seller "somewhere," without providing a specific place or location that they met, and he got into the seller's car.  Additionally, regarding the vehicle pictured in state's exhibit Nos. 2 and 3 — screenshots taken by Turner himself and turned over to the police — the juvenile court asked Turner if the vehicle depicted in the exhibits was the vehicle he intended to purchase.  Initially, Turner expressed doubt, testifying, "I mean, I don't think [the vehicle he intended to purchase] was messed up like [the vehicle pictured in state's exhibit Nos. 2 and 3].  I don't recall [the vehicle] was messed up like that."  Subsequently, the juvenile court asked Turner if he could

identify the vehicle in state's exhibit Nos. 2 and 3 as the vehicle he saw on OfferUp and that he intended to purchase on May 27, 2020. At this point, Turner definitively testified, "[t]hat's the car. That's the car."

{¶ 45} As noted above, Turner could not recall at the hearing the agreed-upon purchase price for the vehicle. Turner had not tendered any payment to the seller prior to the May 27, 2020 meeting, nor did he tender any payment to the seller during the meeting. In fact, Turner testified that he did not bring any money with him when he met the seller. Nonetheless, he claimed he and the seller were driving to the BMV to transfer title.

{¶ 46} Turner did not testify that D.R. knowingly obtained or exerted control over property or services — in other words, tried to steal anything from Turner — when D.R. pulled out a gun inside the vehicle. Rather, Turner testified that "the dude pulled a gun out and once I seen the gun we tussled over the gun in the car." Commission of a theft offense is a required element of aggravated robbery in violation of R.C. 2911.01(A)(1). "Theft" is defined in R.C. 2913.02(A) as follows:

> No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
>
> (1) Without the consent of the owner or person authorized to give consent;
>
> (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
>
> (3) By deception;
>
> (4) By threat;

(5) By intimidation.

**{¶ 47}** The record reflects that the juvenile court addressed Turner's demeanor on multiple occasions during the probable cause hearing. The juvenile court instructed Turner to sit up in his chair and speak into the microphone. The juvenile court emphasized that the proceedings and Turner's testimony "may affect everyone's life in this [courtroom.]" When the prosecutor asked Turner about the nature of the May 27, 2020 incident, Turner replied, "[C]an I get a different question?" The juvenile court called a recess almost immediately when Turner began testifying and explained that Turner needed to talk to his attorney. A reasonable inference can be drawn that Turner was not taking the matter seriously.

**{¶ 48}** The juvenile court did not expound upon its conclusion that "the state failed to present sufficient credible evidence to demonstrate probable cause." Nonetheless, the juvenile court was in a much better position to assess the credibility of the testimony and evidence presented at the probable cause hearing, and this court must defer to the juvenile court's credibility determination. *See In re C.G.*, 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, at ¶ 39.

**{¶ 49}** Turner was the state's only eyewitness. There is no other evidence to establish every element of the aggravated robbery offense necessary to support a finding of probable cause. *In re C.G.* at ¶ 40. If Turner's testimony at the probable cause hearing was not credible, it is not an abuse of discretion to find that the state failed to establish probable cause. Additionally, the record is devoid of any evidence

that D.R. deprived or attempted to deprive Turner of property or services, a necessary element of aggravated robbery.

{¶ 50} Finally, Turner's testimony was the only evidence connecting D.R. to the firearm Turner turned over to police. The state did not present any forensic or physical evidence linking D.R. to the firearm. If Turner's testimony connecting D.R. to the firearm was not credible, the state is unable to sufficiently connect D.R. to the firearm that subjected him to mandatory bindover under R.C. 2152.10(A)(2)(b).

{¶ 51} As noted above, it is apparent that during the probable cause hearing, the juvenile court questioned the credibility of both Turner's eyewitness testimony and Detective Cramer's testimony connecting D.R. to the vehicle in question. In denying the state's motion to transfer the case, it is evident that the juvenile court ultimately concluded that the evidence presented by the state was not credible. We defer to the juvenile court's credibility determination in this regard.

{¶ 52} The instant case can be distinguished from this court's recent opinion in *In re J.R.*, 8th Dist. Cuyahoga No. 110241, 2021-Ohio-2272, which reversed a juvenile court's decision denying the state's motion for mandatory bindover. In *In re J.R.,* the juvenile-appellee was alleged to have participated in the armed robbery of a Dollar Tree store. There were two eyewitnesses to the robbery. One of the eyewitnesses, the store manager, was unable to identify J.R. during a cold stand at the time of the robbery or in court as one of the participants. The other eyewitness, an alleged victim, positively identified J.R. during a cold stand approximately 15

minutes after the robbery; however, this alleged victim did not testify during the probable cause hearing.

> In determining that probable cause was lacking, the juvenile court *did not indicate that the state's identification evidence was not credible*. Rather, as set forth in its journal entry, the juvenile court found that "insufficient evidence [was] presented to demonstrate that there was probable cause to believe" that J.R. committed the offenses at issue because "[n]either the police nor the [store manager] witnessed the alleged robbery" and "the [alleged victim] who remained and [was] later found in the store by police, did not testify at the hearing."

(Emphasis added.) *Id.* at ¶ 36.

{¶ 53} On appeal, this court held that the juvenile court erred in failing to consider the alleged victim's statements to police, including the alleged victim's identification of J.R. from the cold stand, in determining whether probable cause existed to bind J.R. over to adult court. This court explained that the evidence presented at a nonadjudicatory probable cause hearing "need not meet the same standards required for admissibility at trial. Confrontation clause standards for the admissibility of evidence and the Ohio Rules of Evidence do not apply to probable cause hearings." *Id.* at ¶ 37.

{¶ 54} Furthermore, the *In re J.R.* Court concluded that based on the evidence presented by the state at the probable cause hearing, probable cause existed to believe that J.R. participated in the robbery. *Id.* at ¶ 43. The police recovered clothing that J.R. removed as he was fleeing from police. This clothing "matched the description that had been given to police of the clothing that had been worn by one of the perpetrators." *Id.* at ¶ 42. When officers retraced J.R.'s steps

during the police chase, they found a handgun in an area where J.R. had fallen during the chase. *Id.* When officers eventually apprehended J.R., he asserted that he was a juvenile and that another individual had given him the handgun. *Id.* at ¶ 11. This court explained that "although J.R.'s statements to police did not amount to a confession to aggravated robbery, those statements, along with the other evidence presented, support a finding of probable cause." *Id.* at ¶ 42.

{¶ 55} After reviewing the record, we find that *In re J.R.*, 8th Dist. Cuyahoga No. 110241, 2021-Ohio-2272, is factually distinguishable from the present appeal. In *In re J.R.*, the juvenile court "apparently believed" that it could not consider the statements of the eyewitness that identified J.R. at the time of the robbery because the witness did not testify at the probable cause hearing. *Id.* at ¶ 35. In the case at hand, the juvenile court considered Turner's testimony and Turner's identification of D.R. from a photo array, but ultimately concluded that the evidence did not constitute sufficient credible evidence showing probable cause to believe that D.R. committed the acts alleged in the complaint.

{¶ 56} In *In re J.R.*, the court recognized that the "primary issue at the probable cause hearing was identity, i.e., whether J.R. was one of the perpetrators who had participated in the armed robbery[.]" *Id.* at ¶ 35. Here, the primary issue is not an identity question. Rather, the question is what transpired inside the car, whether a crime was committed inside the car, and if so, what crime was committed.

{¶ 57} As noted previously, Turner was the state's only eyewitness who testified about what transpired inside the car and connected D.R. to the gun Turner

provided to the police. At the probable cause hearing, the state was not required to prove the truth of the allegations against D.R. The state "merely had to present *credible evidence showing probable cause* supporting each element" of the aggravated robbery offense subjecting D.R. to mandatory bindover. (Emphasis added.) *In re J.R.* at ¶ 39.

{¶ 58} If Turner's testimony was not credible, then the state cannot establish every element of the aggravated robbery offense, as well as the firearm specification, necessary to support a finding of probable cause and subjecting D.R. to mandatory bindover under R.C. 2152.10(A)(2)(b). Although Turner alleged that D.R. drew a gun inside the vehicle, there was no physical or forensic evidence presented that connected D.R. to the firearm, the gun was not registered to D.R., and his fingerprints were not recovered on the gun. As discussed above, the state did not present evidence on every element of the aggravated robbery offense.

{¶ 59} After reviewing the record, we find no basis upon which to conclude that the juvenile court erred or abused its discretion in denying the state's motion for mandatory bindover. Unlike *In re J.R.*, 8th Dist. Cuyahoga No. 110241, 2021-Ohio-2272, this is not a case where the juvenile court failed to consider evidence presented by the state. Rather, the juvenile court considered the evidence presented at the probable cause hearing, as it was required to do, and concluded that "there is insufficient, credible evidence to show probable cause to believe the child committed the acts alleged in the complaint." The state's sole assignment of error is overruled.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LISA B. FORBES, JUDGE

EILEEN A. GALLAGHER, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR